IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DATACARRIER S.A.,

         Plaintiff,

 v.

WOCCU SERVICES GROUP, INC.,

         Defendant.

OPINION & ORDER

16-cv-122-jdp

---

  This is a copyright infringement dispute over transactional switch software, which is a component of a payment processing system. Plaintiff Datacarrier S.A. alleges that the copyright to its switch software is infringed by the switch software owned by defendant WOCCU Services Group, Inc. (WSG).

  WSG moves for summary judgment. Dkt. 68. Datacarrier's switch software is written in the Cobol programming language, whereas WSG's is written in Java. There is no genuine dispute that WSG has not literally copied any of Datacarrier's source code. But that leaves the possibility that WSG might have copied some other aspect of Datacarrier's software, so that the two programs are nevertheless substantially similar. Datacarrier contends that WSG has copied three aspects of its software: two message formats used to communicate information about transactions and certain ATM configuration information.

  The court concludes that the two message formats are not independently copyrightable because they are derived from pre-existing industry standards, the particular implementation of those standards is driven by functional considerations, and the formats are the digital equivalents of blank fill-in forms, which have long been regarded as not copyrightable. The ATM configuration information is not part of the switch software, and thus it is not copied by

WSG's switch software. Because these three aspects of the switch software are the only substantial points of similarity asserted by Datacarrier, the court will grant summary judgment to WSG and close this case. The court will deny as moot WSG's motion in limine to exclude certain evidence from trial. Dkt. 128.

FACTUAL BACKGROUND

Except where noted, the following facts are undisputed. Additional facts will be provided where pertinent to the analysis.

A.  **The parties**

Plaintiff Datacarrier S.A., is an Ecuadorian software company, which owns transactional switch software called TID, the copyrighted work asserted in this case. The TID source code is registered with the United States Copyright Office, Registration No. TX-7-946-574, effective December 15, 2014. Datacarrier is affiliated (though exactly how is disputed) with a Guatemalan software company, Servicios Tecnologicos de Guatemala S.A. (ServiTech).

Defendant WOCCU Services Group, Inc., a Wisconsin corporation, provides services to credit unions in Latin America. WSG has provided transactional switch services to its affiliates in Ecuador, Peru, Bolivia, and Mexico. WSG's transactional switch software, which Datacarrier alleges infringes its copyright, is called Entura.

B.  **Technical background**

Transactional switch software is used to process financial transactions, such as a cash withdrawal from an ATM or a credit card purchase at a store. For purposes of illustration, we will stick with the ATM withdrawal example. Such a transaction involves a network that connects the ATM from which a card holder would like to withdraw cash to the financial

institution that holds the account and issued the debit card. The network requires communication of the transaction request to the financial institution and communication of the response from the financial institution back to the ATM. The parties use the diagram below to illustrate the pertinent components of the network. The three points of similarity on which Datacarrier bases its allegations of infringement are identified in the diagram as "NDC code," "intra-switch messages," and "switch-to-host messages."



The switch software runs on the "central server." The entity that operates the ATM, and thus receives requests from a card users, is referred to as the "acquirer." The financial institution that maintains the account and determines whether to approve the request is referred to as the "authorizer," the "host," or the "issuer."

The switch software routes messages between the ATM and the authorizer. If the card user's account is with the same financial institution that operates the ATM network, that financial institution's local switch (essentially a local network server) handles the request. But if the user's account is elsewhere—that is, if the acquirer and the authorizer are different institutions—then the transactional switch on the central server transmits the request to the authorizer's server. Thus, to work effectively, the switch software must communicate with

different ATM networks and with different financial institutions. The communications to the local switches operating ATM networks are called "intra-switch messages" and the communications to financial institutions are calls "switch-to-host messages."

The International Organization for Standardization developed the ISO 8583 standard to facilitate transactional switching among financial systems. There are three versions of ISO 8583, identified by the year of their release: 1987, 1993, and 2003. ISO 8583 defines a common standard for message formatting with a library of more than 100 data fields. Financial networks typically adapt and customize the data fields in the ISO 8583 standard to the needs of their networks and the institutions that use them.

**C. Development of the parties' switch software**

In 2009, a company called Multisoft developed transaction switch software called Sharing. ServiTech supplied Sharing switch software to WSG, which sublicensed Sharing to its affiliated ATM-network operators in Ecuador, Peru, Bolivia, and Mexico. Datacarrier provided Sharing-related maintenance and technical support to ServiTech's customers.

Sharing had technical problems, so Datacarrier developed a replacement—the TID switch software. One of the programmers who worked on TID was a former Multisoft employee, Maria Fernanda Martinez. At some point, Multisoft's assets were liquidated in an Ecuadoran legal proceeding, and the Multisoft programmers ended up owning the Sharing software. Martinez had developed a format for switch-to-host messages for Sharing, and she used that switch-to-host message format in TID. Martinez assigned her ownership interest in the switch-to-host message format to Datacarrier. TID is written in the Cobol programming language.

WSG agreed to offer TID to its affiliates. Datacarrier licensed TID to ServiTech, and ServiTech sublicensed it to WSG and its affiliates. But TID had its own problems, and only one of WSG's affiliates—RTC in Ecuador—successfully converted to it. The parties blame each other for the problems with TID, but that the dispute is immaterial to this case.

There was another alternative to Sharing. A Peruvian company, Kuskanet, developed new switch software (which later would be renamed Entura) to address problems that Kuskanet had had with Sharing. The primary programmer was Edwin Ayala, a Kuskanet engineer, who wrote the program in the Java programming language. Ayala began developing Entura in 2010 and it was operational in mid-2011, about the same time as TID was ready for commercial use. Neither Ayala nor anyone on his team had access to the TID program's source code. *See* Dkt. 64. But at some point after Entura was operational, Ayala saw TID in operation at WSG's Ecuadoran affiliate, RTC. Ayala also got a copy of a Datacarrier document—referred to by the parties as the Intercambio Document—that describes the TID program's format for switch-to-host messages. Both TID and Entura use this format, although WSG denies that Ayala made any use of the Intercambio Document in creating Entura, because Ayala received it only after Entura was operational.

In early 2012, Steven Schaefer, WSG's technology manager, visited Kuskanet to evaluate Entura as a potential replacement for Sharing and TID. WSG decided to stop using the TID program and acquire the Entura switch software from Kuskanet. Dkt. 110, ¶ 115. After WSG acquired Entura, it stored the source code on servers in the United States. Entura is actually used, however, outside the United States in the countries where WSG's affiliates operate.

Datacarrier applied for registration of the TID program with the United States Copyright Office on December 12, 2014. On February 26, 2016, Datacarrier filed this suit alleging that WSG infringes the TID copyright by storing or using Entura in the United States.

ANALYSIS

To maintain its copyright infringement claim, Datacarrier must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). And, as the court decided in an earlier order, the infringing acts must take place in the United States. Dkt. 39. Thus, Datacarrier's infringement allegations must be based on Entura software that is kept and used in the United States, not on versions of Entura used in Latin America.

The parties agree that TID and Entura are written in dissimilar programming languages, Cobol and Java respectively, and thus there has been no literal copying of the TID source code. Datacarrier's expert, Howard Cohen, verified this by using code comparison software, although he did not include these results in his report. Dkt. 110, ¶¶ 73-75.

The use of different programming languages would not necessarily preclude substantial similarity in non-literal aspects of two computer programs. Consider, for example, the code for a video game. One could completely re-write the code in a different programming language, and yet closely copy the imagery and narrative structure of the game. The actual code of the two programs would be completely dissimilar, but the two programs would nevertheless be substantially similar in imagery and narrative structure. In that example, the non-literal aspects of the game—imagery and narrative structure—clearly constitute aspects of original authorship protected by copyright. But this case involves software that is more routinely functional than

a video game, so its non-literal features do not necessarily constitute aspects of original authorship.

With literal copying of the code off the table, it is incumbent on Datacarrier, as the party with the burden of proof on its copyright claim, to identify the basis for its allegation that Entura copies protected aspects of TID. Datacarrier cites three points of similarity that it contends support a finding of infringement: (1) the ATM configuration information that Datacarrier calls "NDC code," (2) the format of switch-to-host messages; and (3) the format of intra-switch messages. WSG moves for summary judgment on the basis that the first of these is not actually part of Entura, and the two message formats are not copyrightable.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing WSG's motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in Datacarrier's favor. *Id.* at 255.

## A. Preliminary evidentiary issues

Before turning to the merits, the court begins with some evidentiary issues.

The first issues relate to the opinions of Maria Fernanda Martinez, a Datacarrier employee and one of the programmers who wrote Sharing and TID. Datacarrier proffers Martinez both as a fact witness and as an expert with "extensive training and experience in computer programming and software design and maintenance." Dkt. 97, ¶ 1. WSG asks the court to exclude Martinez's expert testimony. Dkt. 108, at 2–9. The court will exclude her

expert opinions, particularly her infringement analysis. But the court will consider Martinez's testimony as a fact witness.

The first reason Martinez cannot provide expert testimony is that she has not disclosed an expert report that complies with Rule 26(a)(2)(B). Datacarrier apparently assumed that because Martinez is a Datacarrier employee rather than a retained expert, she did not have to serve a full expert report. Accordingly, Datacarrier served only a summary of her opinions, in the form of a 164-page document that looks like a PowerPoint presentation that might accompany live testimony. But that document does not comply with the court's pretrial order, which requires that "[a]ny employee of a party who will be offering expert opinions during any phase of this case must comply with the requirements of Rule 26(a)(2)(B)." Dkt. 24, at 2. As WSG's computer code expert, Daniel Milstein, points out, Dkt. 79-3, at 32, Martinez's summary is hard to follow and it is difficult to understand exactly what her opinions are. The summary document that Martinez provided simply does not make much sense on its own. Summaries of expert testimony tend to lead to disputes about whether the expert has properly disclosed her opinions, which is why the court requires a full written report from employee experts.

The second reason that the court will exclude Martinez's expert opinion is that her infringement analysis relies on an unauthenticated copy of Entura, which she acquired from Datacarrier, which acquired it from a criminal investigation in Ecuador. Purportedly, the copy came from a WSG affiliate, RTC. Under Federal Rule of Evidence 703, an expert can sometimes base a reliable opinion on evidence that would be inadmissible on its own, if it is the type of evidence that experts in that field would typically rely on. But no reasonable copyright infringement analysis could be based on copy of the accused work with such

questionable provenance. We simply don't know how the RTC copy of Entura was collected or what it includes. We know that it is not the same as the Entura copy maintained in the United States. Through discovery in this case, Datacarrier and its retained expert, Howard Cohen, had access to an authenticated copy of WSG's Entura program as maintained in the United States. Martinez did not. So her opinions about whether Entura infringes TID are not based on reliable information. Finally, any admissible component of Martinez's infringement opinions would be cumulative of Cohen's opinions anyway. The bottom line is that the court will consider Martinez's fact testimony only.

The problems with the RTC code also affect the opinions of Howard Cohen, Datacarrier's infringement expert. Cohen relies on the RTC code for two aspects of his analysis. First, Cohen relies on the RTC copy of Entura for his analysis of whether Entura's NDC Code is copied from TID. Cohen acknowledges that the NDC Code is stored in a database separate from the switch software itself. The switch software pulls the NDC Code from the database and then loads it onto the ATM. Cohen therefore did not find WSG's NDC Code in the Entura software that he got through discovery from WSG. Rather, he contends that he was able to derive WSG's NDC Code from the code that was given to Datacarrier by the Ecuadoran police:

> Files collected by the Ecuadorian police in their investigation of RTC (WSG's Ecuadorian affiliate) were provided to me. These included a number of such log files. Using the same one the police used in their analysis, I was able to extract the Entura NDC code in order to compare it with the Datacarrier NDC code.
>
> In particular, I used the log file 23202.log, also used by Ing. Jaime Padilla [the Ecuadoran investigator] in his report (pp. 18-19).

Dkt. 78-13, ¶¶ 7-8. Cohen's analysis of WSG's NDC Code is, like Martinez's infringement analysis, predicated on an unauthenticated copy of code purportedly obtained from RTC. The court deems Cohen's analysis of Entura's use of NDC Code unreliable and inadmissible. And

even if the court considered this part of Cohen's testimony, the most that it would show is that in operation, Entura moves the NDC Code from a database to an ATM. This does not establish that WSG has a copy of the NDC Code in the United States.

Second, Cohen uses the RTC copy of Entura in his analysis of the switch-to-host message format. In Exhibit F to his report, he explains that he based his analysis of the switch-to-host message format on the RTC copy of Entura:

> In the Entura code collected by the Ecuadorian police the java archive (jar) file
>
> > …/Codigo Fuente/SWITCH_ENTURA/WebContent/WEBINF/lib/Tramaiso8583.jar
>
> contains a compiled class, TramaSwitchHost. Using tools available on the web, this archive file was decompiled and the source code for this class reconstructed.

Dkt. 78-16, ¶ 16 (footnote omitted). Although Cohen contends that he "made reference to" parts of the Entura code as produced by WSG (Dkt. 78-16, ¶ 23), he does not explain how that version of Entura mattered in his analysis. He used a file reconstructed from the RTC code to conclude that Entura used the same data fields and names as used in the TID switch-to-host message format. So the foundation of Cohen's analysis is, again, the unauthenticated code from RTC.

Cohen's analysis of the switch-to-host message format has another problem. Cohen acknowledges that the intra-switch message format is based on ISO 8583. Cohen contended that TID had significantly customized the ISO 8583 standard, but he mistakenly compared TID to the 2003 version of ISO 8583. He had missed that TID actually used the 1993 version, so his opinions about the degree of customization are unreliable and thus inadmissible.

(Datacarrier sought to submit an untimely supplemental report to correct this error, but the court did not allow it. Dkt. 125.)

To sum up the evidentiary rulings: the court will consider Martinez's fact evidence, but it will exclude her expert opinions; the court will exclude any analysis based on the unauthenticated RTC version of Entura; and the court will exclude Cohen's analysis of the switch-to-host message format.

B. **Infringement analysis**

In cases involving computer software, many courts analyze infringement with the "abstraction-filtration-comparison" approach first described in *Computer Associates International, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992). Melville B. Nimmer, Nimmer on Copyright § 13.09 (Matthew Bender ed. 2005) (the abstraction-filtration-comparison is the "dominant, albeit not universal, standard"). In brief, the court begins by parsing the allegedly infringed program into its constituent parts, isolating the level of abstraction of each part. The court then filters out the protectable elements of expression from the unprotectable ideas and functions. Finally, the court compares the core of protectable expression in the original work to the alleged infringing work, to determine whether enough of the protectable core has been copied to make the two works substantially similar.

The abstraction-filtration-comparison approach has not been endorsed by the Seventh Circuit Court of Appeals, although at least one district court in the circuit has used it. *See, e.g., Nikish Software Corp. v. Manatron, Inc.*, No. 2010 WL 5099281 (S.D. Ind. Dec. 8, 2010). Regardless of the status of that approach in this circuit, the court need not apply it directly in this case, because the parties have already identified the specific elements at issue. In essence, abstraction is done because Datacarrier has identified the three particular points of similarity

between TID and Entura. And comparison is unnecessary, because for purposes of this motion, the court will assume the Entura uses the same NDC Code and message formats as TID. What's left is, essentially, filtration: the court must determine whether the three asserted points of similarity are part of the core of protected expression in TID.

### 1. NDC Code

Datacarrier alleges that one point of similarity between TID and Entura is that they both use the same data to configure ATM machines that connect to transactional switch software. Datacarrier refers to this data as "NDC Code." WSG contends that this data is more accurately referred to as ATM "customization data." The terminological dispute is not material; the parties agree about what this data is and how it is used. To keep things clear, the court will follow Datacarrier and use the term NDC Code (although the court agrees that it would be more accurate to call it customization data).

NDC Code is used to configure an ATM that connects to the network through which the transaction will be processed. NDC is an abbreviation for NCR Direct Connect, which is an ATM transaction protocol developed by NCR Corporation. NCR has a software suite called NCR Aptra, which facilitates the programming and management of ATMs. The Aptra manual is the source of Cohen's information about how NDC Code works. As WSG points out, the Aptra manual refers to the ATM configuration data as "customization data," which is appropriate because the purpose of the NDC Code is to configure the ATM to operate in a certain way.

There is no genuine dispute that the NDC Code is not part of the switch software itself. Rather, as the parties' experts agree, the switch software pulls the NDC Code from a database, and then loads the NDC Code to the ATM that is accessing the network. WSG has shown that

the Entura switch source code does not include NDC code. *See* Dkt. 110, ¶ 22 (citing Dkt. 79-3, ¶ 23 and Dkt. 61 (Cohen Dep. 70:5-8)). For reasons that are not entirely clear, the TID deposit material (submitted in support of Datacarrier's copyright registration) included two pages of NDC Code. But Cohen did not find this NDC Code anywhere in the Entura software as it was maintained in the United States. Dkt. 61 (Cohen Dep., 56:25–57:7).

Datacarrier argues that Entura is substantially similar to TID because they both use NDC Code in the same way, and they both use the same NDC Code. It's apparent that any network that uses an ATM that has been configured using NCR Direct Connect will have to use NDC Code substantially in the way that both TID and Entura use it. That much is built into the way NCR's ATM configuration software works. So the fact that both Entura and TID pull NDC Code from a database and pass it on to the ATM cannot be the basis for any copyright infringement claim against WSG.

The claim that both TID and Entura use the same NDC Code fails for the evidentiary reasons discussed above: Cohen reaches this conclusion solely on his analysis of the unauthenticated RTC code. But even if both TID and Entura did both use the same NDC Code, WSG has not shown that NDC Code is actually part of the switch software. Cohen tries to describe the NDC Code in a way that makes it appear to be a form of source code, but his explanation makes clear that NDC Code is produced when someone uses NCR Aptra software to set up the configuration of an ATM. Some of this code was included in the TID deposit material, but Cohen did not find this NDC Code in the Entura source code maintained in the United States.

The court concludes that Datacarrier cannot base a viable copyright infringement claim on Entura's use of NDC Code because the NDC Code is not part of the core of protectable

expression in TID. And the Entura code as maintained in the United States does not include NDC Code anyway.

2. Message formats

Entura and TID use the same format for communications with ATM systems and with financial institutions, which are referred to as intra-switch messaging and switch-to-host messaging respectively. Datacarrier contends that these message formats are points of substantial similarity that support an infringement claim against WSG.

WSG contends that the message formats are not copyrightable elements of the switch software because they are not truly original to Datacarrier and they lack enough creativity to constitute authorship. WSG pitches its argument in terms of the doctrines of merger and scènes à faire. "The merger doctrine reflects the principle that where the expression is essential to the statement of the idea, or where there is only one way or very few ways of expressing the idea, the idea and the expression 'merge' into an unprotectable whole." *Woods*, 725 F. Supp. 2d at 821. If the expression merges with the idea, the expression is not protectable. *Altai*, 982 F.2d at 708. Scènes à faire are "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005). These are creditable arguments, and the Second Circuit Court of Appeals invoked the doctrines of merger and scènes à faire in its explication of the filtration step in *Computer Associates*. But here the court undertakes a more direct evaluation of the originality and creativity of the data formats.

Datacarrier contends that the TID message formats are copyrightable as "data structures." Datacarrier relies chiefly on *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350

F.3d 640 (7th Cir. 2003), for the proposition that data structures are copyrightable.[1] But that is not what the Court of Appeals held in *Assessment Technologies.* The case involved a computer program for real estate assessment called Market Drive, which compiled information about real property and organized it into 456 fields arranged into 34 categories. Some municipalities used Market Drive to assist in assessing property, but the underlying data were in the public domain and not copyrightable. On appeal, the defendant, WIREdata, contended that the Market Drive software was itself uncopyrightable. The Court of Appeals promptly dismissed that idea, holding that Market Drive was sufficiently original because no other real estate assessment program had arranged real estate date into those specific 456 fields grouped into those specific 34 categories. The main issue in the case was whether WIREdata could obtain the underlying data without infringing the copyright in Market Drive. The court held that WIREdata could obtain the underlying data, even if the only way to obtain it would involve copying the Market Drive data structure. *Id*. at 645. *Assessment Technologies* does not hold that every "data structure" is copyrightable (and it's not clear that the data structure would have been copyrightable apart from the software that used it).

The message formats in TID are distinguishable from the elaborate data structure in *Assessment Technologies* for several reasons. First, the message formats in TID are far simpler. The format for switch-to-host messages comprises only 24 fields, and each field has only three characteristics—name, length, and data type. The message format for intra-switch messages is

---

[1] Datacarrier cites half a dozen additional district court cases in a footnote. Dkt. 91, at 24 n.16. The court would not have to consider these cases at all—Datacarrier includes only a brief parenthetical comment on each, without analysis to show how their reasoning would be useful to this case. But the court has reviewed the cases. They repeat the basic principles applied in this opinion, and together they show that the copyrightability of data structure, as a non-literal aspect of a computer program, demands a careful fact-intensive inquiry.

also relatively simple. According to Cohen, four message types are pertinent to this case, and they have between 13 and 26 data elements.

Second, the message formats used by TID are not entirely original: they are derived from the industry standard for financial transactions, ISO 8583. Martinez admitted that she used the error codes and transaction codes of ISO 8583 when she developed the switch-to-host message format for Sharing, Dkt. 97, ¶ 19, which was then used by TID. Cohen acknowledges that the intra-switch message format is based on ISO 8583. For reasons given above, Cohen's opinion that TID had significantly customized the ISO 8583 standard is inadmissible.

Third, and most important, functional considerations are paramount in the message formats. ISO 8583 provides a library of more than 100 data fields, but the message formats used by TID and Entura include only the fields that are needed for the kind of transactions performed by the switch software. Martinez says in her declaration that her choices were not dictated by external factors, but this testimony is merely conclusory and manifestly incorrect. Dkt. 97, ¶¶ 23, 24, 33. In designing the switch-to-host format, for example, Martinez was not free to decide whether to include a data field for the card-holder's account number; that field would be required so the financial institution could process the request. Similarly, the length of that field was determined by the need for efficiency: the field had to be long enough to accommodate the account number, but it would be wasteful to make the field longer than required. Martinez's main explanation is that she selected the order of the fields, and she could have made a trillion other choices. Dkt. 97, ¶¶ 22-23. But making an arbitrary selection of the order of the 24 fields demonstrates only trivial creativity, scarcely more than it takes to put the phone book in alphabetical order. *Feist*, 499 U.S. at (1991) ("There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually

nonexistent."). The mere selection from available alternatives does not, by itself, demonstrate the requisite creativity. *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 818 (1st Cir. 1995), *aff'd*, 516 U.S. 233 (1996). Ultimately, transactional switch software must use a data format that provides the information demanded by the other parts of the network with which the switch must interact. As Cohen acknowledged in his deposition, the financial institution dictates the protocol that the switch software must use to communicate with it. Dkt. 61, at 99: 16-24. The design of these simple message formats was shot through with functional and efficiency concerns.

The message formats used by TID are the digital equivalent of blank fill-in forms, which have long been regarded as not copyrightable. The seminal case is *Baker v. Selden*, 101 U.S. 99 (1879), which held that blank account books were not copyrightable, because granting such a copyright would be tantamount to granting a monopoly on using the underlying bookkeeping system. The core principle of that case has become a longstanding Copyright Office Policy reflected in federal regulations:

> The following are examples of works not subject to copyright and applications for registration of such works cannot be entertained:
>
> . . .
>
> (c) Blank forms, such as time cards, graph paper, account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information;

37 C.F.R. § 202.1. The Copyright Office has explained that the rationale for the rule disallowing registration of blank forms is that such forms do not embody an appreciable quantum of original, creative expression, and that registering such a form risks extending copyright to the underlying ideas and systems implemented by the form. Compendium of U.S.

Copyright Office Practices, 3rd ed., § 313.4(G). This would contravene the Copyright Act, which expressly states that copyright does not protect "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." § 102(b). *See also* Registration of Claims to Copyright: Notice of Termination of Inquiry Regarding Blank Forms, 45 Fed. Reg. 63,297 (Sept. 24, 1980) (explaining the reasons for maintaining the long-standing rule against registration of blank forms). The Seventh Circuit Court of Appeals embraced these principles in *Taylor Instrument Cos. v. Fawley-Brost Co.*, 139 F.2d 98 (7th Cir. 1943), in which it held that paper charts for a machine that recorded temperature were not copyrightable.

The principles of *Baker* and the Copyright Office policy apply here. The data formats asserted by Datacarrier are really just short digital forms to be filled in with information necessary to process a transaction. Thus, the data formats "are designed for recording information and do not in themselves convey information." Extending copyright protection to these data formats would give Datacarrier a monopoly on systems that communicate with the local switches or financial institutions that use these formats, which are, after all, derived from industry standards that Datacarrier did not create. We are worlds apart from the original, complex data structure at issue in *Assessment Technologies;* we are dealing with simple, fillable forms, like that in *Taylor Instrument*.

The court concludes that Datacarrier cannot base a viable copyright claim in Entura's use of the switch-to-host or intra-switch message formats.

## C. Conclusion

The court concludes that Datacarrier's claim fails as a matter of law as to each of the three aspects of the switch software that WSG allegedly copied. WSG did not copy the ATM

configuration and the two message formats at issue are not independently copyrightable. This conclusion makes it unnecessary to consider several of WSG's other grounds for seeking summary judgment.

ORDER

IT IS ORDERED that defendant WOCCU Services Group, Inc.'s motion for summary judgment, Dkt. 68, is GRANTED for the reasons given in this opinion. Defendant's motion in limine, Dkt. 128, is DENIED as moot. The clerk of court is directed to enter judgment for defendant and close the case.

Entered March 27, 2018.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge